We really know the argument. We know the arguments. We research the issues at law clerks. So don't feel offended if we come in with our questions because we ask for cases to be argued so that you can help us with issues that we have in the cases. And I know that experienced lawyers before us don't expect to come up and set out the whole thing. But I just wanted you to know, your points will not be ignored if you've made them in the briefs. So with that introduction, let's begin. Ms. Rosenbaum? And this is, I'm calling, Fellner v. Tri Union Seafoods. Good morning. May it please the Court, my name is Adina Rosenbaum and I represent Appellant Deborah Fellner. And I would like to reserve three minutes for a rebuttal. That's granted. Thank you. This case presents the question whether the federal regulatory approach for methylmercury in seafood preempts Ms. Fellner's state law damages claims for mercury poisoning caused by defendant's tuna fish. The most notable thing about the federal regulatory approach to methylmercury in seafood is what the federal government has not done. It has not set a regulatory limit on the amount of methylmercury that can be in seafood. It has not promulgated labeling regulations about methylmercury warnings. And it has not forbidden tuna manufacturers like Tri Union from placing warnings on their labels. What it has done is to issue an advisory and a background to that advisory to certain consumers, telling them that while fish is an important part of a healthy diet, they shouldn't have it more than once or twice a week. It has given internal guidance to its own enforcement section about when to initiate enforcement actions against seafood manufacturers for having adulterated products. And in a different case, it sent a letter to the plaintiff at the urging of an industry lawyer, saying that the specific statutory warning requirement in that case was preempted. Ms. Rosenbaum, can I jump in on just a couple of preliminary matters that really are not, I suppose, at the heart of this case? But there's a contention from Tri Union that a few claims have been waived here. And as a preliminary matter, I wonder if you could address just how, if at all, the personal injury claim remains or is in this case. Was it in the complaint? The personal injury claim was in the complaint. The complaint states claims for injuries caused by both failure to warn and product design. Do you address it in either your opening brief or in the reply brief? And if so, where? We did in the opening brief explain that those claims were not preempted. And that is in the opening brief starting at page 44. And what about the design defect claim? Well, that is the section on design defect claims, which is just- So it's one and the same, the personal injury claim and the design defect? Well, in general, all of the claims here are claims for Ms. Vellner's injuries. So they are all state law claims for both failure to warn and for design defect. All right. Finally, in these preliminary matters, I'm curious about the contention that you raise about certain contested issues. And I think you stated in the plural issues of fact, but I was only able to identify one. And the judicial notice you contend was taken by the district court. What should we make of that here? And what should we do if we were to determine that there was some determination by the district court of a contested issue of fact? I think that's actually an issue that goes more towards what happens on remand. And that was something that we just wanted to make sure that the specific facts that were stated as facts that were found, basically, by the district court, were not treated on remand or in this court as issues of facts that were settled, but that they were still- Was there any contested issue of fact that you contend was present here, other than that mercury cannot be removed from fish meat? Well, there wasn't time to have contested issues of facts. This was decided on a motion to dismiss. I know how it was, but I understand your contention to be that there was a determination by the district court of certain contested issues of fact. Isn't that what you're saying? Right. So do you contend that there was any other determination made by the district court other than that methyl mercury cannot be removed from fish meat? There are not specific ones that we are sort of contesting at this point. Well, in light of Judge Smith's questions, would you explain briefly what your design defect claim is? I don't ordinarily think of these as design defect cases, so I'd like an explanation. The word design, it doesn't seem like an obvious word to apply to this. You're right. But the basic claim is that these were products that were being sold. The tuna was a product being sold by Tri-Union that was not reasonably fit, suitable, and safe for its intended purposes, that it was not reasonably fit and safe to be eaten by consumers like Ms. Vellner. Okay. Thank you. To get back to the issue of preemption, federal law does not preempt state law every time the federal government and state government take a different approach to a problem. There are only certain narrow circumstances under which state law is preempted, none of which exist here. Tri-Union claims it would be impossible for it to comply with federal and state law if Ms. Vellner's claims were allowed to proceed, but that's not the case because federal law places no requirements on Tri-Union with regard to methyl mercury warnings. The advisory, the action level, none of them mention warnings on labels at all. The advisory and the action level aren't aimed at manufacturers like Tri-Union. And even for the people they're aimed at, the advisory doesn't place any requirements on those people. It's just advice. So, Ms. Rosenbaum, this letter that you have brought up in another case, as you correctly characterized it, what weight or deference ought this court to afford to the FDA letter to the California Attorney General? And what does Guyer tell us about that weight or deference? I think there's sort of two questions within that. The first is whether the FDA letter is applicable to this case at all. And the FDA, it is not. The FDA letter does not, doesn't speak to claims like Ms. Vellner's at all. It speaks about a positive statutory warning requirement, not about claims for damages. Proposition 65. Yes, yes. We know that. And Congress and the Supreme Court have recognized at times that even when whole fields are preempted, state law damages claims can often go forward. But this is not a field preemption case, and I assume you would agree that the district court was not crystal clear in the specific type of preemption it was relying upon here. But my impression is that both sides have tacitly agreed that this is not a field preemption case. I agree that it is not a field preemption case. Tri-Union can state its beliefs on that. So what kind of case is it? What kind of preemption case is it? It can't be a conflict case, can it? There's nothing in conflict. Well, that's why there's no preemption in general, that there both is not field preemption and there is no conflict preemption. To return for a moment to Judge Smith's question about the FDA letter, preemption has to be tethered to the federal government doing something. And here, there can't be preemption in a vacuum. Well, can't the absence in some cases of regulation be something? It can, but when that's the case, and where that seems to come up mostly is when Congress has a statute and then specifically revokes that statute with the intent to deregulate an area and to leave it open to no regulation. When that's the case, there needs to be a clear statement of intent by the government that it intends the area to not have any regulation. And there's no clear statement here. And the FDA letter in the California case does not provide that clear statement of intent, both because it doesn't speak to claims like Ms. Fellner's, and then also because it's not an authoritative statement on the part of the agency. It is just a letter sent to the plaintiff in the middle of a case at the urging of an industry lawyer parroting many of the arguments of the industry lawyer. It's a post-hoc rationalization of something the agency had not done, not a contemporaneous statement of something the agency had done. Did anybody invite the FDA to file a brief in this case? In another case that we heard involved preemption in drugs called Chico, which is pending before the panel, the FDA was a party. Has anybody, as far as you know in this case, asked the FDA to take a position? Not as far as I know. We have not been in touch with the FDA. But even at this point, a statement by the FDA would be its position on preemption, not it would be a legal position on preemption, which is a legal decision to be decided by this court. Well, while we're on that subject, I'm not quite sure you finished answering Judge Smith's question about year. Yes. This letter, in our case, purports to be interpreting Section 403 of the Act and says that you can't comply with both conflict preemption. Okay. And didn't the Supreme Court in Geer say, yeah, you've got to have federal law, but assuming you have a federal law, if the agency that's in charge of that law is interpreting it, it's due deference. Well, first, with regard to the Geer case. In fact, Geer said some weight, didn't it? Geer placed some weight. Well, first Geer looked at a contemporaneous statement made in the comments in the federal register that accompanied the actual regulation being interpreted. So Geer made its decision based on contemporaneous comments that were much more formal than a letter. It was something actually published accompanying the regulation at issue. And then after that, after it had already decided that the federal government had meant for there to be different types of passive restraints, it then did look at an amicus brief, again, something more formal than what we have here. Why is it more formal? Well, that was an amicus brief actually submitted to the court rather than just sent to the plaintiffs in the case. Well, and Justice Breyer made a point of characterizing that brief of going as it would in the ordinary course through the solicitor general. But I'm curious in making a comparison between the amicus filed there and what we have here, why is that a process that involves more formality? Maybe it does. I'm just looking for the indicia of formality that exists with the amicus that would not exist here. Well, here the FDA letter is not submitted in the course of this case and was also not something directed to the court in the California case. It was a letter sent to the plaintiffs in that case. And we don't know what sort of thoroughness... Should we make anything of the fact that this letter, this letter from the FDA, was virtually invited by Covington and Burlington? I think that brings into question the thoroughness, the deliberativeness. How so? Well, the FDA itself had its arguments crafted for it, and it brings into question whether this is the FDA's actual opinion, whether it gave thought to crafting this on its own. I've been troubled by this for some time as I've been looking at this case, but I've just not known what to make of it, that is the fact that the letter came virtually in response to a letter from legal counsel. And then comparing them, you can certainly see that the FDA letter has drawn on many of the reasons and the rationale set out in the Covington-Burlington letter. Now, those reasons have to stand on their own, but I'm curious what you make of some language from Geier, and I'm very interested to hear what your adversary says about this, because in the Geier opinion, Justice Breyer says, we have no reason to suspect that the solicitor general's representation of DOT's views reflects anything other than the agency's fair and considered judgment on the matter. And that got me thinking as to whether or not the inducement here to the FDA letter with the reasons why that letter was written ought to be something that we have some suspicion about, to use a word that derives from the word that Justice Breyer used. I think that it does. And the letter purports to be an explanation of something that the FDA did not do and reasons for supplying why the FDA did not do something, why it did not require warnings. But I think the fact that it does seem to have been induced by this letter that came from Covington and Burling does call into question whether those were actually the reasons that the FDA did not require warnings at the time that Ms. Feldner was injured by defendant's products. That leads directly to the question I had, which is what kind of deference, if any, should we give to that letter? Are we talking Chevron? Are we talking Skidmore? We're talking nothing. I would think at the most that it would be Skidmore deference about its power to persuade. And the arguments in that letter are not particularly persuasive. Judge Stapleton brought up the fact that it talks about misbranding and claims that placing a methylmercury warning on labels would render the products misbranded. But what that argument is is that if Tri-Union voluntarily placed a warning on its label, that the FDA would initiate an enforcement action against it for having that warning on its label. Go ahead. Finish that. Well, it's pretty inconceivable to imagine that the FDA would come after a company for placing a voluntary safety warning on its label. And not surprisingly, Tri-Union has come up with no cases where the FDA has actually done that. That also leads to a question that I had, which is how could the FDA go about restricting a warning that it thinks is false and misleading other than bringing a misbranding action? I mean, what can the FDA do in situations like this? Because we're talking about the absence of action. I believe that enforcement actions are how the FDA removes misbranded products from the market. Only thought and no other way. It does have regulations that require some warnings and so that are promulgated pursuant to its ability to remove misbranded products from the market. So why couldn't the FDA just decide they need to jump in and regulate in this area and issue a rank? If the FDA thought that warnings were required, they could do that. But the fact that the FDA has not itself required warnings does not preempt the state law claims here. State regulations can be more stringent than federal regulations. And that does not necessarily make those regulations preempted. I want to take you back to your characterization a few minutes ago of the weight, or you may have used the word valid, validity, of the reasons stated by the FDA. You cast doubt on the weight of those reasons or validity of them. But what about the overexposure contention that the FDA made? Don't you think that carries some weight? Isn't it a basis for concern? I think, well, first, even if it were a basis for concern, an FDA concern does not preempt. It has to be an FDA action that's preempting or intentional inaction that's preempted. How do we know it's intentional inaction? How does the vacuum lead us to understand that that's an FDA position? Well, that's exactly the problem here. The vacuum does not show that it is a conscious FDA position. Well, what can the FDA do to make a position? Are you saying that only an FDA regulation can preempt? I think that an FDA regulation, if we're talking about, say, conflict preemption, would be the most clear way of stating that intent. There may be something somewhat less than that. If there were, it's not this case. But give us some idea what it would be. I can't think of what it would be. If the FDA had sort of extensive and specific regulations of its own pertaining to this issue. Well, sure, but that's a regulation. And what I'm asking you is, short of a statute or a regulation, isn't there some other way that the agency can preempt, as suggested in the cases? Not through inaction. Through inaction there has to be, if the FDA is going to regulate by not doing anything, it has to have a clear statement of intent that its inaction is preemptive and that it intends for there not to be anything in that field. One word I don't think I've heard you mention during your argument is presumption. I don't think I've heard you take any refuge in the prospect of a presumption against preemption. Well, there is a presumption against preemption in the Supreme Court. There is still a presumption against preemption? There is still a presumption against preemption. That's questionable, isn't it? Well, the Supreme Court talked about the presumption against preemption as recently as Bates in 2005. And particularly when we're talking in an area like this, health and safety. But Bates did make clear, did it not, that to the extent the presumption survives, it survives only in areas of traditional state regulation. Is that safe to say? Well, here we're talking about health and safety. I think they talked about it. And here, this is clearly a health and safety area, an area that is traditionally within the state's regulatory power. Yes. So we are working against that presumption against preemption here. Okay. Do you have any more questions? No, I'm content. Okay, thank you. Thank you. We'll hear you again on rebuttal. Mr. Kiernan? Good morning, and may I please the Court? My name is John Kiernan, and I have the honor to represent Tri-Union Seafoods. With me today is Scott Goldstein, who was on the brief, who joins me from New Jersey office. Why don't we pick up right where we left off? Yes. Can the President preempt state law by making a speech outlining his administration's ideas? And, of course, the follow-up question is, can the head of the FDA do it by writing a letter? And what's the difference? The answer is yes, if you have the authority to do it in the first place. And the speech is simply a statement of intent. And the same answer would apply to the commissioner of the FDA. And the significance of this is that the so-called silence or the non-regulatory provision here is, in fact, an affirmative decision. It's not a void. It's not a decision by default. It's an affirmative decision based upon scientific testing. Well, how do we know that? I'm sorry. How does that decision affect? Doesn't that decision have to be effectively manifest in some way so that people know what the, quote, federal law is that preempts the state law? This is serious stuff, preempting state law. Doesn't the federal government have to do something that orders somebody to do something? What does it take? That's true. And if I could springboard off your question just momentarily. The certainty and uniformity of the law is important not just for the national economy, but it's very important for the business entity, the food producer, who, as a good citizen, strives to conform its conduct to the dictates of the law. So it's important on both sides. And the answer is that through the advisories and through the decision-making process, that to the general population methylmercury in fish does not pose a hazard. And in addition to that, based upon the health claim advisory for omega-3 fatty acids, that is a positive benefit that the FDA has taken a position that's reasoned and it's based upon scientific knowledge and research and data that it's a good thing to eat fish. That's why there was an affirmative decision not to issue the warning, so that they've done exactly what you said. They have proselytized. They have, through the advisories, through the health care professionals, through the hospitals, through the GYN, the obstetricians, they're all instructing and educating. And much of this has percolated down through the states, through the Department of Agriculture, and there are state advisories as well, bringing the same issue to the public. All right. Let me put the question another way. What specifically, you say there is conflict preemption here between federal law and state law. I do. Now, understand what the state law is you claim is preempted, but I don't understand quite what the federal law is that you say preempts state law. What specifically is the federal law? The only thing I've heard referred to is Section 403, misleading labeling. Correct, and 201 as well. And you understand that there's some conflict between allowing a jury to award a verdict here and a prohibition on misleading labeling? I go a step higher to the FDA's authority, and that is to ensure pure food throughout the United States, so that there's a general charter which requires that they look to the healthy diet of Americans everywhere, and all people, all subgroups. It's that general charter that gives them the authority to ensure that we all live with a healthy diet. Well, don't they have to do something that indicates that because of that general authority, they think that there is no problem with methylmercury in tuna? The issue is not no problem. The issue is that it's not a health hazard to the general population. It's something that they're clearly looking at and they're monitoring, and they have done so actually since 1969. So the question, I guess, that Judge Stapleton was asking is how have they done so? They continue to monitor the fish that are caught, and it's in the record appendix that from 1990 to 2004, there are substantial data collected as to the different species of fish and the amount of trace. I'm sorry. Did you mean to leave me with the impression that the answer to my question was Section 403 of the Act? No, I go to the general authorizing. What was the federal law that conflicts and preempts the potential jury verdict in this case? It's the exercise of the authority by the FDA, which has granted that power in the FCDA. What is the exercise of that authority? Twofold. One, to ensure that food is pure. That's the general charter. How did they exercise it? They didn't adopt a resolution. They haven't set a standard. How did they exercise, quote, that authority of 403? It's twofold. The statement of the intent is in the letter that we're discussing here today, and that is that it would be a violation under 403. You don't have anything without the letter, do you? Really? You have no basis without the letter? Yes, Your Honor, I do. And if I can go through the chronology, if we start back in 1995 with the advisory, walk it through 2001 and 2004, the Martec petition is very, very important to us. The Martec petition, which was issued in September, September 8th of 2004, is critical because that was vetted. That was a health claim for omega-3 fatty acids. It was vetted through the health claim protocol. It was subject to public comment. It was put out there for 60 days. This is on page 2. It would be 160 of the record appendix in the Martec petition. It's very important that the process utilized by the FDA was very, very supportive of our contention. Hadn't the plaintiff consumed all her tuna fish by then? Yes. However, in that Martec petition, as in the FDA letter in August of 2005, those are simply a memorialization of the data and research and analysis that had taken place from actually 1990, but we see the first advisory in 1995, long before the litigation started and before this particular plaintiff's exposure period from 1999 to 2004. So I believe it does predate. So we not only can have federal law that doesn't result from any formal action, we can have secret law, secret federal law that preempts that nobody knows about. Oh, I don't think it's a secret, Your Honor. There was a good question asked to my sister. No, because there were some consumer bulletins, you mean. No, in addition to that, there's a whole area of whether or not the FDA or the federal government can preempt by not having a regulation. On page 31 of our brief, the citation is to the Arkansas Electric Cooperative. It says that that may be an affirmative decision to leave it unregulated. That is a decision, and that's what happened here. You take the position, I think, that an agency approach may conflict with state law requirements. Is that right? Yes, it's the implementation of that approach as well. Okay, what authority do you rely on for the proposition that an agency approach may conflict with state law requirements? It's a regulatory approach. No, no, what authority do you rely on for that? Well, I think the list of cases as to informal proselytization, that is under Geier. All right, tell us specifically what cases you're relying on for that proposition. Hillsborough, Geier, Meade, and Madison. Those are four cases in which the courts have acknowledged that the intent of the authorizing agency or the regulatory agency can be expressed informally, and that's what has happened here. If the issue is whether or not the educational program is sufficient to reach the entire public, the answer is yes, because what the educational program is is to encourage the consumption of fish, and then with respect to the subpopulation, the target population, to give advisories to that subpopulation group only, because to do otherwise would have the twofold detriment of, one, discouraging the consumption of fish and the health benefits that go along with it, which would be contrary to the FDA's authority. Do you agree with your adversary? You called her your sister. I'm not sure that's very kind. But do you agree that, if anything, what we have here is skid more deference, or do you think this is more a case of Chevron deference? The difference may be semantic, because I know you use the word dispositive. Oh, no, I don't know. I think the difference may be very real. I understand the legal distinction. The word dispositive throws me off. I believe that the Montech petition and the FDA letter is dispositive. Now, I understand why it would not be usually a Chevron type of deference, but it matters not. The reason I said semantic is because we arrive at the same conclusion, and that is this is powerful stuff. This is a very specific, very express statement by the FDA commissioner,  If the FDA had not sent its letter to the California Attorney General in favor of preemption, would the advisory and the backgrounder be sufficient to preempt Ms. Fellner's lawsuit? The quick answer is yes, but I would direct the Court's attention to the Montech petition. That isn't, however, the position that the Covington memo took, is it? Didn't the Covington memo expressly take the position that preemption would not exist in the absence of the letter? That was their position as expressed. I acknowledge that. That's why they wanted the letter. To buttress their argument that the advisories, out of concern that they'd be standing before you people with the same kind of argument, that the advisories, we think, are sufficient. But to go overboard and to be overly conscious and express a specific statement by the FDA is important, and I acknowledge that. Isn't the letter the only coherent explanation of the FDA's position and their objectives regarding methylmercury? I believe not. I believe the Montech petition is very, very significant. It's 26 pages of very detailed analysis. I read it. And I think that that is of equal importance as to the FDA matter. But both of those are a memorialization of the research and data that's contained in the advisories going back to 1995. And to the extent that someone would suggest that this is some kind of a litigation ploy in California, I say no. Because it is a memorialization today of what's happened over the last 10, well, now 13 years. What is false or misleading about the warning that Ms. Fellner suggests? That warning is, I'm quoting, fish and shellfish are an important part of a healthy diet. However, nearly all fish contain traces of mercury that may, in large quantity, cause mercury poisoning. I think that's the warning suggested. Why is that false or misleading? Because it understates the benefit and it ignores the twofold detriment. One, of overexposure to warnings so that we all kind of ignore them. And two, it would discourage members of the general populace from consuming fish. But isn't it true? Is the warning untrue that fish and shellfish are an important part of a healthy diet? That is true. Nearly all fish contain traces of mercury, I ate some last night, that may, in large quantity, cause mercury poisoning. If that's true, what's the harm? I'm not sure you can get to the last component. It is true that all fish contain some level of trace methylmercury. But to get to mercury poisoning is a different factor that requires causation. And some scientific basis, in not only a general sense, but in a particular sense. And the danger here is that if each state came in with a warning, and by the way, New Jersey is simply the reasonably prudent person standard, that there is no warning. The problem is, we would be ceding to a jury the decision as to at what level, for instance, should the action level be at, or the maximum concentration. Should it be one pot per million? Or do we cede to a jury? They could decide it's one pot per billion, under the guise of a reasonably prudent person. And therefore hold our food producers, such as tri-union, liable. And the case that I suggest is very important to us is the San Diego Building Trade Council versus Garland. Because that states very clearly that a judgment, a jury verdict, is a very powerful regulatory tool. And that is something that we are very concerned about, because we would lack then the certainty and uniformity that is required, both on the national level and on the individual food producer level. For myself, the issue is not whether you could have such a program and preempt state law, the FDA that is, but whether they've done so. I mean, how are people supposed to know about this? You point to the letter of the head of the FDA, but if I'm in the fish business, how the hell do I know about a letter that's been written by the director to an individual lawyer in California about a case? Because the importance of the letter is that a warning is inappropriate. We don't want a warning. And if your question is should the FDA send out a, I don't mean to be facetious, but a mass mailing that warning is not required, I think that would be counterproductive as well. Why? I would assume they would set, they'd adopt a regulation that everybody would know about, or set a standard that as a result of a proceeding that everybody would know about. But no warning is required. Yeah, they've done that in the pharmaceutical area when you're dealing with warnings in certain prescription drugs. That may be significantly different, and maybe I'm analogizing to an inappropriate concept, but the learned intermediary is very significant in that area, because the drugs are distributed through pharmacies and through doctors. And that is, I think, something completely different than food products, because we all go in and purchase tuna fish. I'm sorry. I interrupted Judge Stapleton's question. I'm content. I'm sorry. If I could go back. Excuse me. Are you aware of any cases, any case out there, which a court afforded weight to the kind of document that you are relying on in this case? That's what I asked. Yeah. Any case out there? Your adversary has made much of the fact that this has occurred in another case, and that is certainly an interesting and perhaps important point. It is an informal statement. I acknowledge that. There is case law that does support the use of informal statements, and I rely upon those cases. However, if you're asking me can I find one in which the Commissioner sent a letter to the Attorney General of California, no, I don't. But what I'm suggesting, once again, is that that is a memorialization of past practices. And the past practices are not just arbitrary or capricious, but rather are based upon data collection, scientific research, and analysis. Thank you very much. Thank you very much. Your red light is on. Thank you. Thank you. I'd like to first point out that the four cases cited by counsel, of those Hillsborough and Guyer-involved regulations and Meade and Madison, both discuss how informal agency opinions like interpretive statements do not receive significant deference. So all of those cases actually demonstrate that something like the FDA letter here should not be receiving any significant deference. I also want to mention the MARTEC petition on which they're putting a lot of weight. I should say most of the weight. Yes. The MARTEC petition did not forbid warnings. What the MARTEC petition, the FDA's response to the MARTEC petition, said was that not having warnings, that when a manufacturer puts a qualified health claim about omega-3 fatty acids on its food, the fact that it does not include a warning about methylmercury with that health claim does not render the label misbranded. So it rejected, it did not require warnings as a condition of the health claim, but it did not reject having warnings. It did not forbid having warnings. And there's no question in this case. The FDA has not itself required there to be methylmercury warnings on tuna or other seafood. But it hasn't in any way forbidden there to be methylmercury warnings on tuna. To what extent in our review of your arguments should we consider the strange behavior of the plaintiff in this case who claims she ate nothing but tuna fish for five years? I don't think that that's relevant to the question of preemption here. In other words, that's a merits issue and we need not get into that. Yes. The jury might find that a bit speculative, but it shouldn't affect the preemption analysis. Exactly. Okay. It is strange. That's something for the jury to be decided on the merits. Coming from someone who had fish at dinner last evening, that carries some weight. And not only fish. One doesn't usually get sturgeon on the diet. Unless there are any further questions. Well, I don't know. Let me check with my colleagues. I'm content. Thank you. Okay. Thank you. We will take this case under advisement. Do we need to get the transcript? I don't think so. No. Okay. All right. Thank you, counsel.  We'll hear counsel in United States versus Canada.